## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF MISSOURI
## SOUTHEASTERN DIVISION

TIM WASHINGTON,                )
                              )
                Petitioner,    )
                              )
v.                            )     Case No. 1:20-CV-00221-SNLJ
                              )
BILL STANGE,                  )
                              )
                Respondent.    )

### MEMORANDUM AND ORDER

This case is before the Court on a petition under 28 U.S.C. § 2254 for writ of habeas corpus. Petitioner Tim Washington is an inmate at the Southeast Correctional Center in Charleston, Missouri. On May 1, 2013, a St. Louis City jury found Washington guilty of first-degree robbery and armed criminal action. The St. Louis City Circuit Court sentenced Washington to a twenty-five year term of imprisonment for first-degree robbery and a concurrent twenty-five year term of imprisonment for armed criminal action. Bill Stange, Warden of Southeast Correctional Center is Washington's custodian and the proper respondent. 28 U.S.C. §2254 Rule 2(a).  The state concedes the petition is timely filed.

### Statement of the Case

As best as can be discerned, Washington raises thirteen claims in his amended

1

petition. These claims are: (1) that the circuit court erred in admitting two out-of-court identifications of Washington into evidence because the identification resulted from impermissibly suggestive police procedures; (2) that the State made improper remarks during closing argument concerning the potential for Washington to hide the firearm used in the offense; (3) that the Court erred in refusing to give a limiting instruction or to grant a mistrial when the State argued an adverse inference regarding the absence of witnesses; (4) that he was improperly denied a bond reduction on two occasions; (5) that the jury pool was "tainted" because it included venirepersons who knew the prosecutor, the judge, and employees of the police  department; (6) that the seated panel was unconstitutional because all of the members of the seated panel were white; (7) that his counsel provided ineffective assistance because counsel required the use of a wheelchair; (8) that his counsel provided ineffective assistance by failing to file a motion to dismiss the armed criminal action charge; (9) that his counsel provided ineffective assistance by failing to interview each witness before trial; (10) that his counsel provided ineffective assistance by failing to use a surveillance video recording of the offense to impeach a witness's statement; (11) that his counsel provided ineffective assistance by getting his motion for rehearing or application for transfer stricken by the Missouri Court of Appeals; (12) that his counsel provided ineffective assistance in failing to call two witnesses to testify about the potential bias of the officer who initially identified Washington; and (13) that the sum total of the work of each attorney appointed to represent him was ineffective.

**Statement of Facts**

2

The Missouri Court of Appeals summarized the pertinent facts:

On June 2, 2011, Defendant walked into a Circle K gas station around 10 p.m. At the time, Shindell Dinkins was working as a cashier and saw, from where she stood at her cash register, Defendant enter the store carrying a large woman's bag. Dinkins kept her "eye" on Defendant because she suspected that Defendant "was probably coming in to try and stuff product in his bag." Dinkins also noticed that Defendant was "oddly tall" and "so thin."

As Dinkins waited on other customers, she continued to watch Defendant as he walked all the way around the store and then toward her cash register. As he approached, Dinkins saw Defendant pull a gun from the bag. When Defendant reached the register, which was open, he pushed a customer out of the way, reached across Dinkins, and took about $50 from the register while pointing the gun at Dinkins. Defendant then exited the store and walked toward a Metrolink station.

No DNA or other physical evidence linked Defendant to the scene, but the store's surveillance video showed the robbery occurring. Consistent with police department practice, an email containing a still-photo of Defendant from the surveillance video was circulated to the department. Another police officer recognized Defendant and, subsequently, a photo lineup containing Defendant's photo was prepared. Dinkins and another witness who was a customer at the scene, Rhonda Shannon, identified Defendant. Defendant was arrested and, thereafter, Dinkins identified Defendant at an in-person lineup.

Defendant was charged with first-degree robbery and armed criminal action. Before trial, Defendant moved to suppress the out- of-court identification of Defendant, claiming that the photo lineup and in-person lineup were unduly suggestive. After a hearing on the motion, the trial court denied the motion without explanation.

The matter then proceeded to a jury trial, where the State presented the testimony of Dinkins and Shannon, who identified Defendant as the individual who committed the robbery. Dinkins' and Shannon's out-of-court identifications of Defendant, as well as the surveillance video, were also admitted into evidence. At the close of the State's evidence, Defendant presented evidence in support of its defense theory that Defendant's identity had been mistaken. Defendant also presented the alibi testimony of

3

his sister, [Patricia Washington], who testified that Defendant was at her home when the robbery occurred. Ultimately, the jury convicted Defendant as charged and the trial court sentenced Defendant as a prior offender to concurrent terms of 25 years' imprisonment for each conviction.

Resp. Ex. E at 2–3 (footnotes omitted).

## ANALYSIS

## I.    Several of Washington's claims are procedurally defaulted and this Court will deny them for that reason alone.

Where a petitioner fails to present his claim before the state court in accordance with state procedural rules, that claim is procedurally defaulted. *See Beaulieu v. Minnesota*, 583 F.3d 570, 573–74 (8th Cir. 2009). In determining if a claim has been procedurally defaulted, this Court must consider whether the petitioner has exhausted his claim in state court and whether he has preserved the claim for review by complying with the state's procedural rules regulating presentation of that claim. *Id.* at 573. Missouri procedural rules required Washington to present his claim "'at each step of the judicial process' in order to avoid default." *Arnold v. Dormire*, 675 F.3d 1082, 1087 (8th Cir. 2012) (quoting *Jolly v. Gammon*, 28 F.3d 51, 53 (8th Cir. 1994)).

## A.    Washington properly raised his first and twelfth claims in state proceedings; therefore, these claims are not procedurally defaulted.

Washington raised his first claim during direct appeal proceedings and the state court passed judgment on the merits of the first claim. Resp. Ex. B at 10; Resp. Ex. E at 5–11. Washington advanced his twelfth claim in post- conviction proceedings and

4

reasserted it in his post-conviction appeal. Resp.Ex. K at 47–88; Resp. Ex. I at 12–15. Therefore, these claims have not been procedurally defaulted. *See Arnold*, 675 F.3d at 1087.

### B.    Washington partially defaulted on part of his second claim.

In his second claim, Washington argues that the State argued facts not in evidence regarding his potential ability to hide the firearm used in the offense. Doc. 7–1 at 1. Washington assigns two claims of error: (1) that this argument allowed the State to improperly advance a theory that no weapon was presented because Washington disposed of the firearm; and (2) that this allowed the State to improperly bolster its claim that Washington was a "liar." *See id.*

In disposing of Washington's second claim, the Missouri Court of Appeals indicated that the first part of Washington's claim was preserved, but that Washington had abandoned the second subordinate part by failing to contemporaneously object or include the allegation of error in his point relied on. Resp. Ex. E at 15 n.7. To preserve a claim for review in Missouri courts, a criminal defendant must make a specific, contemporaneous objection, *State v. Driskill*, 459 S.W.3d 412, 425–26 (Mo. banc 2015), include the same error in a motion for new trial, *State v. Clay*, 533 S.W.3d 710, 718 (Mo. banc 2017), and carry that same allegation forward into his appellate brief. *See Woods v. Mo. Bd. of Prob. & Parole*, 481 S.W.3d 57, 59 n.2 (Mo. App. 2015) (discussing that where an appellant fails to include a claim of error in his points relied on, that claim is abandoned). Therefore, this Court will only consider the first part of Washington's second claim.

5

**C.    Washington partially defaulted his third claim by abandoning a portion of it and failing to preserve the remainder.**

In his third claim, Washington alleges that the circuit court failed to provide a limiting instruction after the State argued an adverse inference regarding the absence of witnesses, shifting the burden of production and proof to Washington. Doc. 7–1 at 2. The Missouri Court of Appeals stated it would not consider the portion of Washington's argument concerning the State's alleged shifting of the burden, indicating that Washington had abandoned it by failing to develop support in the argument portion of his appellate brief. Resp. Ex. E at 16 n.8.

Further, this Court is barred from considering the other part of this claim concerning the propriety of any adverse inference or limiting instruction because the Missouri Court of Appeals determined that Washington also failed to preserve that claim. *Id.* at 16–18. Although the Missouri Court of Appeals nevertheless reviewed that claim under the plain-error standard, such review does not purge Washington's default. *See Clark v. Bertsch*, 780 F.3d 873, 874 (8th Cir. 2015) (resolving an intra-circuit panel split concerning AEDPA review after a state court engages in plain-error review). Therefore, no matter how this Court construes Washington's third claim, it will deny it on the ground of procedural default alone.

**D.    Washington procedurally defaulted his fourth through eleventh claims and his thirteenth claim in state proceedings and this Court will deny them for that reason alone.**

Washington did not raise his fourth, fifth, or sixth claim in direct appeal

proceedings. Resp. Ex. B at 10–12; Resp. Ex. E at 3–4, 5, 11, 16. Similarly, Washington failed to raise his seventh, eighth, ninth, tenth, eleventh, and thirteenth claims in his amended post-conviction motion or during post- conviction appeal proceedings. Resp. Ex. K at 47–88; Resp. Ex. I at 12–15.  Washington does not attempt to excuse this procedural default except as to his eleventh claim—that his counsel provided ineffective assistance by getting his motion for rehearing or application for transfer stricken by the Missouri Court of Appeals.  *See* Doc. 7-1 at 18.  Washington attempts to invoke the narrow exception to procedural default announced in *Martinez v. Ryan,* 566 U.S. 1, 14 (2012), to excuse the default. But because the claim asserts ineffective assistance of appellate counsel, he is categorically unable to invoke *Martinez* to excuse his procedural default. *See Davila v. Davis*, 137 S. Ct. 2058, 2065–70 (2017) (the equitable exception announced in *Martinez* does not apply to claims of ineffective assistance of appellate counsel).

Each of these claims are procedurally defaulted and this Court will deny them for that reason alone. *See Arnold*, 675 F.3d at 1087.

## II.        AEDPA deference applies to Washington's preserved

### A. AEDPA deference

Under the statutory provisions of AEDPA, the state court's decision is entitled to deference unless the adjudication of the claim: (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[,]" 28 U.S.C. § 2254(d)(1); or

(2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2).

The "contrary to" and the "unreasonable application" clauses contained in § 2254(d)(1) have distinct meanings. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court's decision is contrary to clearly established federal law where: (1) the court "applies a rule that contradicts the governing law" set forth by the Supreme Court of the United States; or (2) the state court "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." *Id.* at 405–06.

The decision of the state court involves an unreasonable application of federal law if the court "correctly identifies the governing legal principle from [Supreme Court] decisions but unreasonably applies it to the facts of the particular case." *Bell v. Cone*, 535 U.S. 685, 694 (2002). "In order for a state court's decision to be an unreasonable application of [Supreme Court] case law, the ruling must be 'objectively unreasonable, not merely wrong; even clear error will not suffice.'" *Virginia v. LeBlanc*, 137 S.Ct. 1726, 1728 (2017) (quoting *Woods v. Donald*, 575 U.S. 312, 316 (2015)). To prevail on this "intentionally difficult to meet" standard, *Woods*, 575 U.S. at 316 (citations and quotations omitted), a petitioner must demonstrate "that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

8

Under the provisions of § 2254(d)(2), a reviewing federal court is bound by the state court's factual findings unless the state court made a "decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Factual determinations made by state courts are presumed correct and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence to obtain habeas relief. *Nicklasson v. Roper*, 491 F.3d 830, 834 (8th Cir. 2007); *Miller-El Dretke*, 545 U.S. 231, 240 (2005). A factual determination is not unreasonable "merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). Moreover, the existence of some contrary evidence in the record does not demonstrate that the state court's factual determination was unreasonable. *See id*. at 302–03.

### B.    The Missouri Court of Appeals did not unreasonably apply federal law in denying Washington's first claim.

In denying Washington's first claim, the Missouri Court of Appeals first set forth the applicable law governing the admissibility of identification testimony:

> Identification testimony is inadmissible if the pretrial identification procedure was unnecessarily suggestive and the suggestive procedure made the identification unreliable. *State v. Body*, 366 S.W.3d 625, 629 (Mo. App. E.D. 2012). This test
> contemplates a two-prong inquiry for determining whether identification testimony is admissible. *Foster v. State*, 348 S.W.3d 158, 161 (Mo. App. E.D. 2011). First, the Court determines whether the police procedures used were impermissibly suggestive. *Id*. at 162. "Police procedure is unduly suggestive if the witness's identification of the defendant results from the procedure or actions of the police, rather than from the witness's recollections of his or her firsthand observations." *Body*, 366 S.W.3d at 629. If "the witness has an adequate basis for the identification independent

> of the suggestive procedure," then it cannot be said that unduly suggestive police procedures tainted the identification. *State v. Floyd*, 347 S.W.3d 115, 125 (Mo. App. E.D. 2011).
>
> Only if the procedure was unnecessarily suggestive does the Court reach the second prong of the inquiry whether the suggestive procedure made the identification testimony unreliable. *Body*, 366 S.W.3d at 629. "In determining the reliability of a witness's
> identification, we consider: (1) the opportunity of the witness to view the subject; (2) the witness's degree of attention; (3) the accuracy of any prior description given by the witness; (4) the level of certainty demonstrated by the witness in making the identification; and (5) the interval between the event and the identification procedure." *Floyd*, 347 S.W.3d at 125.

Resp. Ex. E at 5–6.

While the Missouri Court of Appeals did not explicitly invoke any specific decision of the Supreme Court of the United States in denying Washington's challenge, the state decisions it cited in support unequivocally track and employ binding Supreme Court precedent. *See Perry v. New Hampshire*, 565 U.S. 228, 237–240 (2012) (discussing the long line of cases in which the Court's precedent regarding admission of eyewitness identification developed). Indeed, the Missouri Court of Appeals correctly indicated that it was required to engage in a two-part test that obligated it to first consider whether the reported police conduct was unduly suggestive and, once deciding that answer in the affirmative, to consider a series of factors designed to determine if the identification was otherwise reliable. Resp. Ex. E at 5–6. This approach was described with approval in *Perry*, 565 U.S. 237–240, and the Missouri Court of Appeals's formulation of the indicia-of-reliability factors mirror those set forth in *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972). Because the Missouri Court of Appeals correctly identified the applicable

10

principle of law as announced by the Supreme Court of the United States, the only question left for this Court is whether the state court unreasonably applied the line of identification cases discussed in *Perry*. *See Bell*, 535 U.S. at 694.

Applying the first prong of the test for admissibility of eyewitness identifications, the Missouri Court of Appeals initially considered whether the actions of the officers prior to, and during, the use of photographic and in- person lineups were unduly suggestive:

> At the hearing on the motion to suppress and at trial, Detective Douglas McPherson testified that he created the photo lineup containing Defendant's photograph after interviewing witnesses at the scene and after a fellow police officer identified Defendant in the surveillance video. According to McPherson, Defendant's most recent mugshot on file appeared to match that of the robber described by witnesses at the scene and in the video. McPherson testified that he then created the lineup using a computer program that uses the suspect's characteristics to populate the lineup with other individuals of similar skin tone, height, weight, hair, hairstyle, and facial hair. McPherson explained that the program generates about 30 photographs of similar individuals, from which an officer then selects the five individuals that best resemble the suspect to create the lineup. In the photo spread prepared in this case, McPherson indicated that Defendant was the lightest- skinned individual of the six individuals depicted and four out of the six individuals had some facial hair, including possibly Defendant. McPherson testified that he did not notice that Defendant was wearing a similar red-checked shirt in the mugshot used for the photo lineup as Defendant wore on the night of the robbery.
>
> About a week after the robbery, McPherson showed the photo lineup to Shannon, telling her consistent with standard procedure that "the photo lineup contains six photos, [that the] suspect may
> or may not be in the photos [and to] view each photo and let me know if [you recognize] anybody." Shannon testified that she immediately identified Defendant because she "noticed the face and everything about him[,] [t]he shirt, everything."
>
> Another detective, Detective Angela Hawkins, testified that she showed the same spread to Dinkins the day after Shannon identified Defendant.

11

Hawkins said that she told Dinkins that "the person who was responsible could or could not be depicted in these photos, and if [the person] were or were not, [you] should let me know." Dinkins testified that she identified Defendant in the photo spread and told Hawkins that she was 100 percent certain in her identification. According to Dinkins, she picked Defendant's photo because "that's [the] man that I saw rob the store." Dinkins further explained that she had not noticed that he wore a similar shirt in the lineup as on the night of the robbery, but that she identified Defendant as the robber because "[h]e was very close to me in the store, and that's the same guy that I saw. We were face to face. It wasn't hard to pick him out."

The day after Dinkins identified Defendant in the photo spread, McPherson conducted an in-person lineup during which Dinkins identified Defendant from a viewing room. McPherson explained that he would select three other individuals of similar height, weight, and body style for the victim to view. For Defendant's lineup, McPherson indicated that he had the individuals sit down because Defendant is "very tall." Dinkins testified that she identified Defendant because she recognized "how thin his face is .
. . how skinny he is," and the noticeable discolorations of his complexion. She again indicated that she was 100 percent certain in her identification. Both Shannon and Dinkins later identified Defendant at trial.

Resp. Ex. E at 6–8 (alterations in original) (footnote omitted).

After reviewing the record, the Missouri Court of Appeals stated that there was no evidence indicating "the police took any action that made either the photo lineup or the physical lineup impermissibly suggestive." *Id.* at 8. In support, the court specifically noted that the police employed a computer system designed to select individuals with characteristics similar to Washington, picked individuals from that computer-generated list with characteristics similar to Washington, and then presented the two eyewitnesses the photo lineups without making any threats or promises to either. *Id.*

Further, the court indicated that the eyewitnesses were informed that the perpetrator "may or may not be in the photo spread and to simply indicate whether the

12

robber was present." *Id.* These sorts of considerations undertaken by the Missouri Court of Appeals mirror the considerations employed by the Supreme Court of the United States in determining the relative suggestiveness of any police procedure. *See Simmons v. United States*, 390 U.S. 377, 385 (1968) (indicating that police conduct was not unduly suggestive because, *inter alia*, FBI agents did not suggest which persons included in the picture lineup were under suspicion). The Missouri Court of Appeals then remarked "[e]ach witness thereafter identified Defendant *based on their memory of the robber, their recollection of Defendant's face and, in Dinkins case, his unique features*." Resp. Ex. E at 9 (emphasis added). Put another way, the court noted that the

eyewitness identifications of Washington were a result independent of any police action. *See id.*

The court further noted that, for the in-person lineup, the police "selected individuals similar in height, weight, and body type, and three of the four individuals (including Defendant) had lighter complexions." *Id.* Of particular importance, the court observed that the police had the individuals sit down during the in-person lineup because Washington is "very tall." *Id.* Finally, the Missouri Court of Appeals specifically denied each of Washington's arguments:

(1) that the lineup was impermissibly suggestive because of perceived dissimilarities between him and the other individuals in the lineup; (2) that he was the only individual in both the photo and physical lineup; (3) that his photo in the lineup depicted him wearing a shirt similar to the one he wore on the night of the robbery; and (4) that eyewitness

13

identifications are inherently unreliable. *Id.* at 9–11.

The court denied Washington's first through third arguments stating that under the totality of the circumstances, nothing argued by Washington demonstrated the police conduct was unduly suggestive. *Id.* at 9–10. This totality of the circumstances analysis is the same standard employed by federal courts. *See, e.g.*, *Foster v. California*, 394 U.S. 440, 442 (1969). The court denied the fourth claim in quick fashion stating that Washington's cited psychological studies were "not informative with respect to the question in this case whether the police procedures used were unnecessarily suggestive." Resp. Ex E. at 10. This refutation accurately states the applicable federal law. *See Perry*, 565 U.S. at 237–240. Therefore, this Court will Washington's first claim because he is unable to demonstrate that the decision of the Missouri Court of Appeals "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

### C.     The Missouri Court of Appeals did not unreasonably apply federal law in denying the preserved portion of Washington's second claim.

In the undefaulted portion of his second claim, Washington asserts that, during closing argument, the State argued facts not in evidence. Doc. 7–1 at 14–15. More precisely, Washington contends that when the State suggested places Washington could have hidden the firearm after the robbery, it was testifying to facts that were not in the record and about which no witness could be cross-examined. *Id.*

In denying Washington's second claim, the Missouri Court of Appeals first

14

recognized that prosecutors are given "substantial latitude in closing argument." Resp.

Ex. E at 12 (citations omitted). It next stated that during closing argument a prosecutor

may comment on the evidence or credibility of the defendant's case and in so doing

"counsel may even belittle and point to the improbability of the untruthfulness of specific

evidence, and may suggest reasonable inferences for the jury to draw from the evidence."

*Id.* (citations and quotations omitted). The court cautioned that "[a] prosecutor cannot,

however, argue facts not in evidence or inferences not supported by the evidence." *Id.*

The Missouri Court of Appeals then reproduced the relevant portions of the State's

closing argument.

> [THE PROSECUTOR]: When you find him guilty of the robbery, first
> degree, next you find him guilty of the armed criminal action. Why? They
> piggyback on each other. The armed criminal action is for doing this
> robbery with a real weapon, with a deadly weapon.
>
>         *       *       *
>
> What other evidence do we have that this gun is real, that it's a deadly
> weapon? Here we go. You saw [Shannon's] expression yesterday. She was
> shaking so hard when she saw that surveillance video. She started crying
> and bawling. She got very, very, very, very scared and upset. You could see
> her reliving it. She thought she was going to die in that convenience store.
> [Dinkins] told you it was real. She said that was pointed at me, and I took a
> moment and I looked him right in the face because I knew I needed to
> remember him. That is a real gun.
>
>         *       *       *
>
> He had his finger on the trigger. He threatened multiple people, pointed it
> right at this woman. This is a real gun, and the evidence shows that it's a real
> gun. It's that circumstantial evidence. It's like that rain that we talked about
> outside. You saw the puddles. You saw the umbrella. You've got all the
> circumstantial evidence. Put those puzzle pieces together. You know that

this is a real gun. I don't have it in the courtroom, *but think of all the places it could be. In a house somewhere, hidden in the bottom of river*. It's not the first time as Detective McPherson told you –

[DEFENSE COUNSEL]: I'm going to object. Arguing facts not in evidence.

THE COURT: Overruled

[THE PROSECUTOR]: It's not the first time Detective McPherson told you that a gun wasn't recovered. Doesn't mean it wasn't real, and it doesn't mean it didn't happen. You saw how he was using that gun in the video. You can see in this still the fear on this woman's face. They know it was real, and it was. [Emphasis added.]

Resp. Ex. E at 12–13 (alterations in original).

Finally, the Missouri Court of Appeals stated:

Clearly, the prosecutor's main argument was that the firearm need not be in evidence to establish Defendant's guilt and that circumstantial evidence could establish that the gun Defendant wielded was real. *The prosecutor's point that the gun could be "somewhere" is an inference from McPherson's testimony that it is not unusual to not recover a firearm after a crime and was likely intended to rebut a contrary inference that Defendant's guilt had not been established because the gun had not been located.* McPherson's testimony in this regard was properly admitted and the prosecutor simply made a reasonable inference from McPherson's testimony that Defendant may have disposed of the firearm or otherwise hid it from police discovery. Moreover, we fail to see how the result of the trial would have been different had the prosecutor not made these remarks, given that the only disputed issue at trial was the identity of the robber and the other evidence against Defendant was overwhelming, including eyewitness identifications and a surveillance video.

*Id.* at 13–14 (emphasis added).

The decision of the Missouri Court of Appeals mirrors the estimation of

prosecutorial power during closing arguments expressed by many federal courts. *See, e.g.*, *United States v. Mullins*, 446 F.3d 750, 760 (8th Cir. 2006) (indicating that the

16

prosecutor is limited to the evidence and any reasonable inference drawn therefrom, but may use "colorful language" and argue his or her personal interpretation of the evidence). Further, the United States Court of Appeals for the Eighth Circuit employs a similar approach in addressing prosecutorial misconduct claims before it in the first instance. *See United States v. Conrad*, 320 F.3d 851, 855 (8th Cir. 2003). Under that standard, there is a two part test for determining prosecutorial misconduct: "(1) the prosecutor's remarks or conduct must have been improper, and (2) such remarks or conduct must have prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial." *Id.* There are three factors to consider in evaluating prejudice: "(1) the cumulative effect of such misconduct; (2) the strength of the properly admitted evidence of the defendant's guilt; and (3) the curative actions taken by the court." *Id.* (quoting *United States v. Hernandez*, 779 F.2d 456, 460 (8th Cir. 1985).

Put simply, the Missouri Court of Appeals recognized that Washington's claim was meritless because the State argued a reasonable, and therefore permissible, inference from the evidence presented. *See* Resp. Ex. E at 13–14.

This recognition tracks the applicable federal law; consequently,  Washingtonis unable to demonstrate that the decision of the Missouri Court of Appeals "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. Accordingly, the undefaulted portion of Washington's second claim will be denied. *Id.*

**D.      The Missouri Court of Appeals did not unnecessarily apply federal law in denying Washington's twelfth claim.**

Washington's twelfth claim is based on ineffective assistance of counsel. In *Strickland v. Washington*, 466 U.S. 668, 687–96 (1984), the Supreme Court announced a two-part test by which courts are to analyze ineffective assistance of counsel claims. In order to succeed on a *Strickland* claim, a petitioner must demonstrate: (1) that his counsel failed to exercise the customary skill and diligence of a reasonably competent attorney in the same or similar circumstances; and (2) that he was prejudiced by that deficient performance. *Id.*

In applying the first, or performance, prong of *Strickland*, courts employ a highly-deferential standard, analyzing counsel's performance free from the distorting influence of hindsight. *Id.* at 689. A petitioner must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. The reviewing court "must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* In making that determination, however, the reviewing court should recognize that there are countless ways to provide effective assistance and that counsel is strongly presumed to have rendered constitutionally adequate assistance. *Id.* at 689–90. To this end, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" *Id.* at 690.

In order to prevail on the second, or prejudice, prong of *Strickland*, a petitioner

18

must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* This standard requires the reviewing court to consider, *inter alia*, the governing legal standard. *Id.* at 695. Where the petitioner "challenges a conviction the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. Put another way, "a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent [counsel's] errors." *Id.* Petitioner's failure to establish either *Strickland* prong defeats an ineffective assistance of counsel claim. *Worthington v. Roper*, 631 F.3d 487, 498 (8th Cir. 2011).

In the context of a section 2254 petition, *Strickland* review is particularly exacting. *See Harrington*, 562 U.S. at 105. Indeed, both the *Strickland* and AEDPA standards are "highly deferential" and when they apply in tandem, the review is "doubly deferential." *Id.* (citations omitted). Therefore, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

Washington actually presents two claims of ineffective assistance raised during post-conviction proceedings as a single claim—the twelfth—in the instant petition. Doc. 7–1 at 13. Because the Missouri Court of Appeals addressed both claims together, this Court will do the same. *See* Resp. Ex. L at 6. In his twelfth claim, Washington argues that

19

his counsel was ineffective for failing to call his brother, Robert Washington ("Robert"), and another individual, Conrad Tatum, to testify about the alleged bias of the officer that originally identified Washington. Doc. 7–1 at 13.

In state court, Washington advanced the claim that counsel was ineffective for failing to call Robert to testify that Officer Stanley Coleman was biased against Washington "because [Robert] had been injured while helping Officer Coleman's father and then sued the Colemans and obtained a settlement." Resp. Ex. L at 6–7. Washington alleged that Robert's testimony, would have provided evidence that Officer Coleman's bias led to him being initially targeted as a suspect. *Id.* at 7. Washington also asserted that his counsel should have called Conrad Tatum, who would have testified that: (1) Officer Coleman was biased against Washington because Washington told Officer Coleman's father that "Officer Coleman had taken out the starter as well as spark plugs from Coleman's father's car to prevent him from driving," which caused a disagreement between Officer Coleman and his father, *Id.* at 4; *accord* Resp. Ex. I at 34; and (2) that Tatum dropped Washington off at Washington's sister's apartment at 9:30 p.m. on the night of the robbery, in support of Washington's alibi defense. Resp. Ex. L at 5; Resp. Ex. I at 34.

In denying Washington's twelfth claim, the Missouri Court of Appeals first stated that Tatum's testimony would not have provided a viable defense:

> At trial, Movant's sister testified that Tatum had brought Movant to her apartment around 9:20 p.m. on the night of the robbery, and that Movant stayed with her that night and at no point left. She testified that the two

> played cards and chess and ate and watched TV together. This testimony
> which placed Movant at his sister's apartment at 9:20 or 9:30 did not
> provide an alibi for Movant's presence at the Circle K at 10:00 p.m.
> Therefore, Tatum's testimony would not have produced a viable defense.
> *Worthington*, 166 S.W.3d at 577.

Resp. Ex. L at 8–9. This determination is the result of a reasonable application of

*Strickland* because *Strickland* review necessarily requires a court to consider the viability

of the other possible actions available to counsel. *See Strickland*, 466 U.S. at 687–96.

Further, the Missouri Court of Appeals found that the ineffective assistance of counsel

claim regarding Tatum's alibi testimony was meritless because this testimony was merely

cumulative of testimony provided by Washington's sister. Resp. Ex. L at 9. The Eighth

Circuit Court of Appeals has repeatedly recognized that counsel is not ineffective for

failing to present evidence that is cumulative of evidence already presented. *Bucklew v.*

*Luebbers*, 436 F.3d 1010, 1020 (8th Cir. 2006); *Hall v. Luebbers*, 296 F.3d 685, 693 (8th

Cir. 2002).

    After discussing the circumstances surrounding the identification of Washington

by the two eyewitnesses previously discussed above, the Court concluded the opinion by

stating:

> Finally, as the State correctly points out, regardless of any potential bias by
> Officer Coleman, he was not involved in the various lineups *in which two*
> *witnesses independently and positively identified Movant as the robber at*
> *the Circle K.*
>
> In conclusion, neither of Movant's claims of possible police bias towards
> him nor cumulative evidence that Movant had been dropped off at his

> sister's residence before the robbery would have changed the outcome at trial. The record refutes Movant's claims that trial counsel was ineffective or that he suffered prejudice therefrom. Therefore, the motion court did not clearly err in overruling, without an evidentiary hearing, Movant's Rule 29.15 motion on the basis of counsel's failure to call Washington and Tatum to testify at trial. Points I and II are denied.

Resp. Ex. L at 10–11 (emphasis added). This denial reasonably applies the prejudice prong of *Strickland* by considering whether there was a reasonable probability—meaning "a probability sufficient to undermine confidence in the outcome"—that but for counsel's errors the result would have been different. <u>466 U.S. at 694</u>. Washington has not demonstrated otherwise; therefore, this Court will deny his twelfth claim.

## Conclusion

For the foregoing reasons, the Court will deny the petition for a writ of habeas corpus

**IT IS FURTHER ORDERED** this Court will not issue a certificate of appealability because Johnson has not made a substantial showing of the denial of a federal constitutional right.

SO ORDERED this 23rd day of February, 2021.



_____
STEPHEN N. LIMBAUGH, JR.
SENIOR UNITED STATES DISTRICT JUDGE

22